**IN THE SUPREME COURT OF THE STATE OF IDAHO**
**Docket No. 35062**

| | |
|---|---|
| **PANIKE & SONS FARMS, INC.,** ) | |
| ) | |
| **Plaintiff-Appellant,** ) | |
| ) | |
| v. ) | |
| ) | |
| **RANDY SMITH and JANINE SMITH,** ) | |
| **husband and wife, individually and in their** ) | |
| **separate capacity, dba FOUR RIVERS** ) | **Boise, June 2009 Term** |
| **PACKING CO.,** ) | |
| ) | **2009 Opinion No. 96** |
| **Defendants-Respondents.** ) | |
| ------------------------------------------------------ ) | **Filed: July 9, 2009** |
| **FOUR RIVERS PACKING CO., an Idaho** ) | |
| **corporation,** ) | **Stephen W. Kenyon, Clerk** |
| ) | |
| **Plaintiff-Respondent,** ) | |
| v. ) | |
| ) | |
| **PANIKE & SONS FARMS, INC.,** ) | |
| ) | |
| **Defendant-Appellant.** ) | |
| ) | |
| ) | |

Appeal from the District Court of the Third Judicial District, State of Idaho, Washington County. Hon. Stephen W. Drescher, District Judge.

Contract dispute, <u>affirmed</u> in part and <u>remanded.</u>

Nixon Peabody, LLP, Rochester, NY for appellant. David L. Cook argued.

Walker Law Office, Weiser, for appellant.

Bruce H. Birch, Payette, argued for respondents.

BURDICK, Justice

This action involves a dispute over a pre-season contract between Appellant Panike & Sons Farms, Inc. (Panike) and Respondent Four Rivers Packing Co. (Four Rivers) for the sale of onions. The contract stated that the buyer (Four Rivers) would designate the fields from which the onions would come, and then required that the onions "meet 75% three-inch minimum

1

requirements." Panike contends that the district court erred in finding that Panike breached the contract by failing to deliver onions from the fields specified by Four Rivers. Panike also argues that the district court improperly calculated the damages awarded to Four Rivers. We affirm in part, but remand for an entry of judgment on damages consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Panike is an Oregon based corporation, operated by Greg Panike, that raises crops including onions. Four Rivers is an Idaho corporation organized for the purpose of purchasing onions from area growers, packing, and contracting to resell those onions nationwide. Randy Smith is the general manager of Four Rivers. In January 2006, Panike entered into a contract with Four Rivers for the sale of onions from Panike's 2006 and 2007 onion crops. The contract required Panike to deliver 25,000 hundredweight (cwt) 75% three-inch minimum field run onions to Four Rivers from fields specified by Four Rivers, for the price of $4.75 per cwt. The field selection clause stated the "[b]uyer will specify field(s)."

In mid-August 2006, Mr. Panike contacted Mr. Smith, who owns farmland adjacent to Panike's land in Malheur County, Oregon, to inform him that water leaking from Mr. Smith's ditch was running into Panike's field. During that conversation, Mr. Smith told Mr. Panike that Four Rivers would be designating the fields from which Panike was to deliver the 25,000 cwt of onions. Mr. Panike then informed Mr. Smith that Panike would not deliver onions from those fields, as Mr. Panike believed those onions were a different variety and larger than those specified by the contract. On August 15, 2006, Four Rivers sent a letter to Panike reiterating that it would designate the fields from which the onions were to be delivered. Four Rivers sent another letter to Panike on August 25 designating the fields, with a map attached that illustrated which fields Four Rivers had chosen.

On October 3, 2006, Panike attempted to deliver two truck loads of onions to Four Rivers's packing shed. When Mr. Panike arrived, Janine Smith, part owner of Four Rivers and wife of Mr. Smith, asked Mr. Panike whether the onions were from the specified fields. When he stated they were not, Mrs. Smith rejected the onions. Panike then had the onions inspected by the Idaho Department of Agriculture, which determined the onions were 89% three-inch minimum or larger.

On September 28, 2006, Four Rivers filed a lien on Panike's crops in the amount of $182,539.00 pursuant to the terms of the contract. On November 22, 2006, Panike filed suit

against Four Rivers in its corporate capacity. Although originally scheduled for a jury trial, the parties stipulated to waive trial before a jury and tried the case before the court on October 29, 2007. Judgment was entered on January 28, 2008 in favor of Four Rivers in the amount of $311,250.00, with attorney fees in the amount of $16,680.00, and costs in the amount of $1,194.79, for a total judgment of $329,124.79. Panike filed its Notice of Appeal on March 7, 2008 and its Amended Notice of Appeal on March 19, 2008.

## II. ANALYSIS

### A. Standard of review.

When reviewing the decision of the district court, the district court's findings of fact will not be set aside unless clearly erroneous. *Shore v. Peterson*, 146 Idaho 903, __, 204 P.3d 1114, 1118 (2009). "Thus, even if the evidence is conflicting, if the findings of fact are supported by substantial and competent evidence this Court will not disturb those findings on appeal." *Id*. Evidence is substantial if a reasonable trier of fact would accept and rely upon it in determining findings of fact. *Akers v. D.L. White Constr., Inc.*, 142 Idaho 293, 298, 127 P.3d 196, 201 (2005). Furthermore, this Court will give due regard to the district court's appraisal of the credibility of witnesses who personally appear before the court. *Hughes v. Fisher*, 142 Idaho 474, 479-80, 129 P.3d 1223, 1228-29 (2006). However, in reviewing the district court's conclusions of law, this Court may draw its own conclusions from the facts presented. *Shore*, 146 Idaho at __, 204 P.3d at 1118.

### B. Four Rivers properly rejected the onions tendered by Panike.

Panike argues that the onions it attempted to deliver to Four Rivers conformed to the contract in kind, quality, condition, and amount, and therefore Four Rivers wrongfully rejected onions that met or exceeded every essential element of the contract. Four Rivers counters that the contract speaks in terms of minimum quality requirements and specifically allows Four Rivers to designate the fields. In addition, Four Rivers argues that designation of onion fields is a method of dealing regularly observed in the onion trade justifying an expectation that it would be observed with respect to the transaction here.

Where the language of the contract makes the intentions of the parties clear, the interpretation and legal effect of the contract are questions of law over which this Court exercises free review. *Lickley v. Max Herbold, Inc.*, 133 Idaho 209, 211, 984 P.2d 697, 699 (1999). When interpreting a contract provision, we must view the entire agreement as a whole to discern the

3

parties' intentions. *Id*. Here, the language at issue in the contract simply stated: "Buyer will specify field(s). The onions described above must meet 75% three-inch minimum requirements." That language specifically states that Four Rivers would specify the fields from which Panike would tender onions. However, Mr. Panike testified he believed that any designation of fields was to occur when the contract was signed. In contrast, Four Rivers contends that, in accordance with I.C. § 28-1-303(c) and (d), the usage of trade among onion growers allowed for the fields to be designated during the growing season.

Pursuant to I.C. § 28-1-303(c) "usage of trade" is "any practice or method of dealing having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage must be proved as facts." In addition, I.C. § 28-1-303(d) provides that usage of trade "of which [the parties] are or should be aware is relevant in ascertaining the meaning of the parties' agreement, may give particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement."

The district court found that Four Rivers had "established through the combined testimony of Steve Walker, George Rodriguez, Floyd Johnson, Dennis Ujiiye, and Randy Smith that the designation of fields in mid to late summer is the normal practice in the industry." Mr. Walker testified that his business monitors the fields of the growers it contracts with throughout the season and then requests certain fields: "So generally with our growers we will go out and say, yeah, we'd like to have this field, and they'll say, well, will you take part of this field and part of this field, you know. So there is a little give and take . . . ." Mr. Rodriguez testified that his company usually makes field designations in July, so if a field does not meet requirements the company can designate another field. Mr. Johnson stated that, as manager and vice president of Lynn Josephson Produce, he enters into pre-season contracts with area growers that reserve the right to specify fields, and that the fields are specified at the time of harvest. In contrast, Mr. Ujiiye, as a grower, testified that he did not sign pre-season contracts because he "didn't want the buyer to be able to designate the fields." Finally, Mr. Smith testified that Four Rivers always includes a provision allowing it to specify fields in preseason contracts. Mr. Panike also testified that he was familiar with the designation of fields in the onion business, but his understanding was that such designation was to take place at the time of contracting.

4

The district court based its determination that designating fields during the growing season was the usage of the onion trade on substantial and competent evidence. Therefore, Four Rivers had a contractual right to designate the fields from which Panike was to tender the onions.

If goods fail in any respect to conform to the terms of the contract, a buyer may reject them. *Keller v. Inland Metals All Weather Conditioning, Inc.*, 139 Idaho 233, 237, 76 P.3d 977, 981 (2003); I.C. § 28-2-601(a). More specifically, I.C. § 28-2-601 states:

> [I]f the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may
>
> > (a) reject the whole; or
> > (b) accept the whole; or
> > (c) accept any commercial unit or units and reject the rest.

Four Rivers first sought to exercise the field selection provision on August 15, 2006 when it sent a letter to Panike informing Panike that Four Rivers would be designating the fields within the next few days. On August 25, 2006, Four Rivers sent a letter to Panike designating the fields. Panike concedes that it refused to deliver onions from the fields specified by Four Rivers.

We find, based upon the clear language of the contract and usage of trade, that Four Rivers had a right to designate the fields. Therefore, when Panike attempted to deliver onions that were not from the designated fields, Four Rivers rightfully rejected the non-conforming goods.

**C.  There was a meeting of the minds sufficient to form a valid, enforceable contract.**

Panike asserts that there was no meeting of the minds at the formation of the contract because Four Rivers intended to use the field selection clause to obtain onions of a different size than the parties bargained for. In addition, Panike argues that Mr. Panike believed any designation of the fields was to take place at the signing of the contract.

There must be a meeting of the minds between parties for a contract to be formed. *Barry v. Pacific West Constr., Inc.,* 140 Idaho 827, 831, 103 P.3d 440, 444 (2004). "A meeting of the minds is evidenced by a manifestation of intent to contract which takes the form of an offer and acceptance." *Id.* Four Rivers argues that the district court's following statement indicates the court found, as a matter of fact, that Panike manifested its intent to contract through the actual formation of the contract:

> On January 13, 2006, Panike and Four Rivers entered into a contract under which Panike agreed to deliver 25,000 hundred weight of 75% three-inch minimum yellow onions to Four Rivers during the 2006-2007 season at $4.75 per hundred

5

weight, and a like amount at a minimum of $4.50 per hundred weight in the 2007-2008 season. Prior to signing the contract, the parties reviewed the contract together and mutually agreed to delete paragraph 6.

We agree. As stated above, the language of the contract was clear when it stated the "[b]uyer will specify field(s)." In addition, designating fields during the growing season was common usage in the onion trade. Panike argues that its only understanding upon entering into the contract was that it had agreed to provide 25,000 cwt of 75% three-inch minimum field run onions. Panike seems to argue that those contract terms meant it *only* needed to provide 75% three-inch minimum field run onions, and if that was not the case then there was no meeting of the minds. However, the contract provision allowing for the specification of fields spoke in terms of minimums:

> Buyer will specify field(s). The onions described above [25,000 cwt field run at $4.75] must meet 75% three-inch *minimum* requirements. If the onions do not meet the *minimum* specifications, they will be subject to a one cent per CWT deduction from the contract price for each percent below the 75% three-inch *minimum*. In the event the onions fail to make *minimum* size requirements, they will be state inspected at the Grower's expense.

(Emphasis added.) We affirm the district court's determination that the contract was valid and binding and allowed Four Rivers to designate fields, even though the field designation allowed Four Rivers to obtain larger onions.

## D. Four Rivers did not breach its duty to deal in good faith.

Panike contends that Four Rivers attempted to obtain onions of a larger size than the parties bargained for in breach of its duty of good faith. Four Rivers asserts that this issue was not raised before the district court and should not be considered on appeal. In the alternative, Four Rivers argues that it did not take any action that was inconsistent with the terms of the contract signed by the parties.

Idaho Code § 28-2-311(1) states:

> An agreement for sale which is otherwise sufficiently definite to be a contract is not made invalid by the fact that it leaves particulars of performance to be specified by one of the parties. Any such specification must be made in good faith and within limits set by commercial reasonableness.

[Citation omitted.] "Upon every contract, the [Uniform Commercial Code] imposes an obligation of good faith in the performance or enforcement of the contract. Both parties to the

6

contract have a duty to act in good faith." *Potlatch Corp. v. Beloit Corp.*, 132 Idaho 712, 715, 979 P.2d 114, 117 (1999) (citation omitted).

As established above, the district court found that Four Rivers had "established through the combined testimony of Steve Walker, George Rodriguez, Floyd Johnson, Dennis Ujiiye, and Randy Smith that the designation of fields in mid to late summer is the normal practice in the industry." In addition, the clear language of the contract allowed the buyer, Four Rivers, to specify the fields from which the onions would be delivered. Therefore, we find that Four Rivers did not take any action inconsistent with the terms of the contract or the usage of trade and thus acted in good faith.

**E.    The district court erred in its calculation of damages.**

Panike finally argues that even if it breached the contract, the district court erred in calculating damages by setting the market price at $18.00 per cwt and then adding the packing costs. Panike also contends it was entitled to damages for Four Rivers's wrongful lien and an offset for money held by Four Rivers.

First, we find Panike is not entitled to damages. Panike argues that the district court erred in not offsetting a check for $2,800.00 that was written to Four Rivers on Panike's sale of wheat to Weiser Feed and Storage due to the lien. There was no evidence that this check was ever negotiated or tendered; therefore, we will not address this issue. Panike also asserts that the district court erred in failing to address its argument that it was entitled to damages for the wrongful filing of the lien. Before the district court, Panike argued that the lien was wrongful because Panike was not in breach of the contract. In contrast, on appeal Panike has argued that the lien was wrongful because it was filed prior to Panike's actual breach. The issue of whether the lien was wrongful because it was filed too early was not raised below. Therefore, the district court did not err in failing to award damages to Panike because the court found the lien was not wrongful, as Panike was in breach of the contract. Thus, Panike is not entitled to damages or an offset as a result of its breach of contract.

However, we find that the district court did err in its calculation of the award of damages to Four Rivers. Idaho Code § 28-2-711(1) states:

> Where the seller fails to make delivery or repudiates or the buyer rightfully rejects
> or justifiably revokes acceptance . . . the buyer may cancel and whether or not he
> has done so may in addition to recovering so much of the price as has been paid

7

(a) "cover" and have damages under the next section as to all the goods affected whether or not they have been identified to the contract; or

(b) recover damages for nondelivery as provided in this chapter (section 28-2-713).

The requirements for "cover" are set out in I.C. § 28-2-712, and include "making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller." I.C. § 28-2-712(1). Recovering damages pursuant to I.C. § 28-2-713 does not require showing good faith without unreasonable delay; instead, damages are based upon market price at the time of the breach. I.C. § 28-2-713(1) states:

> [T]he measure of damages for nondelivery or repudiation by the seller is *the difference between the market price at the time when the buyer learned of the breach and the contract price* together with any incidental and consequential damages provided in this chapter (section 28-2-715), but *less expenses saved in consequence of the seller's breach*.

(Emphasis added). Thus, when a buyer rightfully rejects goods, the buyer can either cover and recover as damages the difference between the cost of cover and the contract price, or recover as damages the difference between the market price and the contract price. *Keller v. Inland Metals All Weather Conditioning, Inc.*, 139 Idaho 233, 239-40, 76 P.3d 977, 983-84 (2003). Furthermore, I.C. § 28-1-305 provides that these remedies "shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed . . . ."

Four Rivers contends that the district court did not err in calculating its damages by setting the market price at $18.00 per cwt and considering the packing costs in its final determination. In the alternative, Four Rivers argues that even though the district court referred to I.C. § 28-2-713 in its decision, it appears to have relied on I.C. § 28-2-712 in its actual calculation of damages, and thus its consideration of cover costs was correct.

We find Four Rivers's arguments unconvincing. The district court's calculations were made pursuant to I.C. § 28-2-713, and those calculations were in error. First, had the district court used I.C. § 28-2-712 for its calculation of damages, an evaluation of whether Four Rivers covered "in good faith and without unreasonable delay" would have been necessary. I.C. § 28-2-712(1). The district court engaged in no such analysis, nor did Four Rivers put forth any evidence during the trial regarding the propriety of its cover pursuant to I.C. § 28-2-712. Instead, Four Rivers presented evidence of the market price at the time of breach and asked for damages

8

pursuant to I.C. § 28-2-713. The district court then used the analysis required by I.C. § 28-2-713, examining the difference between the market price at the time of breach and the contract price, less expenses saved in consequence of the breach. Specifically, the district court stated:

> At trial, the uncontroverted testimony of Janine Smith, who owns a one-half interest in Four Rivers, was that the market price of three-inch minimum yellow onions as provided for under the contract was $18 per hundred weight on October 3, 2006. Thus, market price for the onions at the time of the breach was $450,000. The price Four Rivers would have paid Panike pursuant to the contract was $4.75 per hundred weight, or $118,750.
>
> Under this contract, Four Rivers would have also expended $6 per hundred weight to pack these onions. When purchasing onions to fill their contracts, 10,000 hundred weight purchased from Ujiiye Farms for $22 per hundred weight were already packed. Therefore, there was a savings of $2 in expense per hundred weight on this first 10,000. The cost for the remaining onions was $24 per hundred weight, which included the packing fee., [sic] thus, there was no savings to Four Rivers on this 15,000 hundred weight. Thus, the total expenses Four Rivers saved totaled $20,000. Based on the foregoing, Four Rivers' damages are $450,000 less $118,750, less $20,000, for a total of $311,250.

The district court's calculation of damages is problematic. First, the uncontroverted evidence presented at trial shows that the market price for *unpacked* onions on the date of the breach was $12.00 per cwt.[1] The district court is correct in its statements that Mrs. Smith testified that the market price on October 3, 2006 was $18.00 per cwt and that Four Rivers would have expended $6.00 per cwt to pack the onions it was purchasing from Panike. However, the district court did not take into account that the $18.00 per cwt market price was for packed onions.

The evidence that was presented only supports a finding that the market price for the onions Four Rivers contracted for with Panike was $12.00 per cwt. At trial, both Mr. and Mrs. Smith testified that the market price at the time of the breach on October 3 was $12.00 per cwt for unpacked onions. Mr. Smith did testify that the prices paid to Ujiiye and Peterson Farms of $22.00 per cwt and $24.00 per cwt were the market prices on the days those onions were packed, but those purchases were made after the breach occurred. After discussing the prices paid for replacement onions, Mr. Smith testified as follows:

---

[1] Four Rivers set the date of breach as October 3, 2006, when Panike's delivery was rejected by Four Rivers, and Panike also relied on this date in its briefs on appeal as the date of breach.

9

Q. Okay. And if I understand you correctly then, you would be asking the court to award you damages for the onions you purchased from Peterson Farms and Dennis Ujiiye that replaced the ones you anticipated from Panike and Sons?

A. Actually, I think that if you figure the amount that we're asking for was the price that was based off of the onion market on October 2nd and 3rd, which would equate to about $12 per hundredweight.

Mr. Smith later referred to the lien filed against Panike and stated they had calculated the lien amount based upon a market price of "$12 per hundred, on 25,000 hundredweight." Therefore, Mr. Smith referred to $12.00 per cwt as the market price throughout his testimony. Mrs. Smith was also questioned as to the market price at the time of breach:

Q. And at the outset I advised the court that we were talking about damages of approximately $180,000. Do you know how we acquired that figure?

A. If you look at the Market News Report, which I believe is one of the exhibits . . . on that date, the Market News price for a jumbo onion was $9—or nine and a half. You double that to get to a hundredweight, you're at $18, less the $6 per hundred packing cost, for a net of 12. And his contract amount was $4.75.

So if you take $12 minus the 4.75, you end up with 7.25 per hundredweight, and that replacement cost based on Market News on October 3 would have been $181,250.

Counsel for Four Rivers stated initially in the trial that Four Rivers was asking for an award of damages of approximately $180,000.00, which is consistent with the testimony of both Mr. and Mrs. Smith. In addition, the lien claimed on September 28, 2006 also estimated the cost to be $12.00 per cwt, for a total damage amount of $182,539.00, taking into account attorney and filing fees. Furthermore, in a September 15, 2006 letter from Four Rivers's counsel to Panike, the market price was stated to be $12.00 to $15.00 per cwt for "onions comparable in size and quality to those you agreed to deliver."

The first time Four Rivers argued that the market price was $18.00 per cwt, unpacked, was in its written closing argument. At that time, Four Rivers erroneously incorporated the prices it paid for replacement onions into its calculation of damages under I.C. § 28-2-713. Four Rivers argued:

Had Plaintiff delivered conforming onions, Defendant would have expended $6.00 cwt. to pack them before shipping to its buyers. Pursuant to § 28-2-713(1) the $6.00 per cwt. packing cost would normally be an "expense saved in consequence of the seller's breach" as Defendant would have to pay that same amount to pack the replacement onions. Smith testified that 10,000 cwt. replacement onions purchased from Ujiiye farm did not have to be packed as they

10

had already been boxed. He further testified that the price paid Peterson Farms, $24.00 cwt., included the packing fee. Accordingly, Defendant realized no savings by virtue of Plaintiff's breach.

Therefore, Four Rivers was suddenly requesting total damages in the amount of $331,250.00. The district court then used those numbers in its analysis, but determined that Four Rivers had realized a savings of $2.00 per cwt on the 10,000 cwt of onions purchased from Ujiiye, so the court subtracted $20,000.00 from the damages award.

The district court erred in considering the prices paid by Four Rivers to cover the 25,000 cwt of onions in determining the expenses saved in consequence of the breach. First, the district court did not have sufficient evidence to consider the replacement prices. The district court used $18.00 per cwt as the price for unpacked onions, apparently on the basis that Four Rivers paid $24.00 per cwt for the packed onions it purchased from Peterson Farms and the cost of packing was $6.00 per cwt. The court then found that Four Rivers saved $2.00 per cwt on the 10,000 cwt of onions purchased from Ujiiye by only paying $22.00 per cwt. The district court would have had to base this finding on evidence of the market price for onions on the days Four Rivers purchased from Ujiiye and Peterson Farms, but evidence was not presented on that issue. This is because, throughout the proceedings, Four Rivers only asked for damages pursuant to I.C. § 28-2-713 and thus only presented evidence of the market price on the day Panike breached.

Therefore, the court erred by considering the costs to cover in determining damages for Panike's breach. Instead, the district court needed to apply I.C. § 28-2-713 to "put [Four Rivers] in as good a position as if [Panike] had fully performed . . . ." I.C. § 28-1-305. Had Panike fully performed, on the date of breach Four Rivers would have had 25,000 cwt of onions worth $12.00 per cwt ($18.00 per cwt market price for packed onions minus the $6.00 per cwt Four Rivers testified it cost to pack the onions) for which it paid $4.75 cwt. Thus, the proper damages calculation under I.C. § 28-2-713 for the 25,000 cwt of onions is the market price of $300,000.00 minus the contract price of $118,750.00 for a total damages amount of $181,250.00—the price that was requested by Four Rivers throughout the proceedings. There were no expenses saved by Four Rivers as a result of the breach because the contract included no terms regarding packing; thus, packing costs should not be considered in putting Four Rivers in "as good a position as if [Panike] had fully performed." I.C. § 28-1-305. Therefore, we remand to the district court for an entry of judgment consistent with this opinion.

**Q. Attorney fees on appeal.**

Four Rivers is not entitled to attorney fees on appeal because Four Rivers did not prevail on all legal issues presented. Four Rivers did prevail on the issue of breach of contract; however, Panike prevailed on the issue of the appropriate measure of damages. Therefore, we find that neither party is entitled to attorney fees or costs on appeal.

### III. CONCLUSION

We affirm the district court's determination that Four Rivers's rejection of the onions was proper, but remand for an entry of judgment consistent with this opinion.

Chief Justice EISMANN and Justices J. JONES, W. JONES and HORTON, **CONCUR.**