## IN THE SUPREME COURT OF THE STATE OF IDAHO
### Docket No. 42465

| | |
|---|---|
| **DONNELLY PREHN and DWIGHT BANDAK,** )<br><br>   **Plaintiffs-Respondents,** )<br><br>**v.** )<br><br>**MICHAEL L. HODGE, II,** )<br><br>   **Defendant-Appellant,** )<br><br>**and** )<br><br>**THE SOURCE STORE, LLC; THE SOURCE, LLC; GEORGE M. BROWN; and CHRISTOPHER CLAIBORNE,** )<br><br>   **Defendants.** ) | **Boise, August 2016 Term**<br><br>**2016 Opinion No. 143**<br><br>**Filed: December 8, 2016**<br><br>**Stephen W. Kenyon, Clerk** |

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County.  Hon. Patrick H. Owen, District Judge.

We <u>affirm</u>. Attorney fees and costs on appeal are <u>awarded</u> to respondent.

Davison, Copple, Copple & Copple, Boise, attorneys for appellant. Ed Guerricabeitia argued.

Taylor Law Offices, PLLC, Boise, attorneys for respondents. Matthew K. Taylor argued.

---

W. JONES, Justice

## I.  NATURE OF THE CASE

The Source Store LLC ("Source 1"), The Source LLC ("Source 2"), Michael L. Hodge ("Hodge"), George M. Brown ("Brown"), and Christopher Claiborne ("Claiborne") (collectively "Appellants")  appeal the district court's order denying their Joint Motion to Dismiss, by which they sought to dismiss the derivative claims brought by Donnelly Prehn ("Prehn") and Dwight

Bandak ("Bandak") (collectively "Respondents") on behalf of Source 1. Additionally, Appellants appeal the district court's finding that Hodge breached his fiduciary duty to Source 1 and its members.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Background of Source 1

In 2002, Hodge and Prehn founded Source 1, an Idaho LLC, which designed, produced, and sold merchandise and apparel for its clients.[1] For Source 1's initial years, it did not generate an annual profit. During this time, Prehn made loans to Source 1 with the understanding that he would be paid back with 10% interest accruing annually. Also during this time, Prehn was not paid a salary for a number of months, with the understanding that he would be paid at a later time with interest.

Source 1 began to show an annual profit around 2008. Due to his deteriorating relationship with Hodge, Prehn stopped working as a fulltime employee of Source 1 after December 2010, but Hodge worked fulltime until its dissolution in 2012. Hodge was the managing member and main salesperson of Source 1 from its inception until its dissolution, but he was not its only employee. Between the formation of Source 1 in 2002 and February 2011, Bandak, Brown, and Claiborne joined Source 1 as part owners. By the time of its dissolution, the members' interests in Source 1 were as follows: Prehn—37.975%; Hodge—39.637%; Bandak—11.025%; and Brown and Claiborne—11.363% (combined).

In February 2011, Hodge proposed a salary increase for himself from the $60,000 per year he was being paid at the time, to $144,000 per year. Prehn and Bandak opposed the proposal, but Hodge, Brown, and Clairborne voted in favor, so the increase was approved and effectuated.

On November 1, 2011, Source 1 moved its main office to 3637 Lake Harbor Blvd., Boise, Idaho. Unbeknownst to Prehn, Hodge purchased the Lake Harbor building on April 5, 2012. On December 31, 2011, Source 1's in-house accountant/bookkeeper informed Hodge and Prehn that the outstanding balance on Prehn's loan was $79,232.51, and that the present balance of back pay Source 1 owed Prehn was $67,500. Source 1 made no further payments to Prehn.

Also in 2011, Hodge borrowed $40,000 from Source 1. By April 26, 2012, the remaining balance on his loan was $20,084.61. Hodge has not made any payments on the loan since, but

---

[1] Prior to 2002, Hodge operated Source 1 as a sole proprietorship.

argued to the district court that he voluntarily reduced his salary from Source 1 in 2012 and that the reduction should have been credited against his debt. On February 3, 2012, a valuation of Source 1 by a business brokerage firm determined that the most likely selling price for Source 1 was $1,367,068. On March 15, 2012, Hodge made an offer to purchase Prehn's interest in Source 1 for $337,000. Prehn rejected the proposal.

## B. Dissolution of Source 1

The members unanimously voted to dissolve Source 1 on April 4, 2012, with the dissolution to be as of April 1, 2012. The Operating Agreement for Source 1 ("Operating Agreement") provided that in case of the dissolution of Source 1, a "Liquidator" was to be appointed by a "Majority Vote of Membership Shares" to "wind up the affairs of the company and make final Distributions as provided in this Agreement and in the Act." The Liquidator was to work "diligently" at the task with "all of the power and authority of the Members." The Operating Agreement required the Liquidator to give an accounting of Source 1's assets and liabilities "[a]s promptly as possible after dissolution and again after final liquidation," give notice to its creditors, and "sell or liquidate all of the Company's assets."

The Operating Agreement further provided that the proceeds of such sale or liquidation were to be distributed first to the Company's creditors—including Members—then to establish "any Reserve that the Liquidator deems reasonably necessary for contingent or unforeseen obligations of the Company." Any balance remaining was to be distributed to the Members in accordance with the "positive balances in their Capital Accounts." Hodge, Brown, and Clairborne voted to appoint Hodge as Liquidator, and Hodge accepted the appointment.

On April 9, 2012, Source 1 received a very large order ($233,481.84) from its largest customer, Bodybuilding.com. Source 1 never processed this order. On April 13, 2012, the members participated in a telephone conference call with Source 1's attorney concerning the dissolution process. Hodge estimated that Source 1 could still fill its existing orders if it reduced its staff by half and that the orders could be filled by the first week of June. Hodge also predicted that such orders could be filled at a profit.

On April 16, 2012, Brown filed a Certificate of Organization for Source 2, which listed Brown, Hodge, and Desiree Clairborne as members. Hodge is the majority owner and a managing member of Source 2. On April 25, 2012, the final Statement of Dissolution for Source 1 was filed. After the dissolution of Source 1, both Prehn and Hodge planned to create new

businesses to operate in the same market in which Source 1 previously operated. Prehn and Bandak filed this suit against Appellants on April 27, 2012.

**C. Miscellaneous Assets and Benefits**

Prior to its dissolution, Source 1 provided Hodge with a vehicle. On April 26, 2012, Source 1 still owed $19,761.22 on the vehicle, which Hodge paid on or about April 26, 2012. As of April 31, 2012, the value of the vehicle was $22,060. Before its dissolution, Source 1 made a deposit of $36,000 to a shaker cup manufacturer to gain a discount on shaker cup orders. Because Source 1 only used $17,712.17 of the credit, Source 2 used the balance of $18,287.83 to obtain a discount on its orders of shaker cups. Source 1 also made a deposit of $12,400 on a second shaker cup mold priced at $31,000. Source 2 used the deposit made by Source 1 to obtain the second mold after it paid the balance of $18,600.

Source 1 also purchased a license to the business software "ProfitMaker" for $8,000 and had its employees spend time to improve it. Hodge transferred the software to Source 2 before the dissolution of Source 1 even though he claimed at the district court that he purchased it at the auction. Neither Hodge nor Source 2 ever compensated Source 1 for the credits toward the discount with the manufacturer or the credits toward the second shaker cup mold. Nor did they pay Source 1 for the "ProfitMaker" software. Prehn and Bandak filed their Complaint—and First Amended Complaint—against Source 1 and derivative actions on behalf of Source 1 against Hodge, Brown, and Clairborne on April 27, 2012, alleging breach of agreement and breach of fiduciary duty. On May 7, 2012, Source 1 issued a check for $20,000 to counsel for Hodge to cover litigation costs from defending this action.

**D. Order of Dissolution**

The parties stipulated to the entry of an Order for the Dissolution of Source 1 on May 8, 2012, and the district court issued the Order of Dissolution on May 17, 2012. The Order of Dissolution stated that the dissolution was to take place "as soon as reasonably practicable, with the participation and cooperation of all parties, in a manner which is fully transparent, accountable, fair and equitable to all members of Source 1." The Order of Dissolution further stated that the dissolution would be conducted with the goal of paying off all of Source 1's debts and maximizing the funds left over for the members. According to the Order of Dissolution, Source 1 had approximately $900,000 in open purchase orders, which were to be filled by Source 1 employees using company assets. The Order of Dissolution further stated that the

4

members had agreed to reduce the overhead of Source 1 during its dissolution to the absolute minimum required to fill the open orders.

In addition, the Order of Dissolution stipulated that Hodge would propose a budget for the completion of the dissolution and circulate the budget among the members. The budget included those employees that Hodge deemed necessary to complete the open orders. The Order of Dissolution also indicated that no party was to use any of Source 1's assets for the benefit of "Source 2 or any other person or entity."

### E. Auction of Source 1's Assets

As the Liquidator of Source 1, Hodge prepared an auction of the company's assets on May 18, 2012. Prehn and Hodge submitted the following bids at the auction:

Lot 1: Shaker cup molds. Hodge bid $40,200. Prehn bid $96,000.

Lot 2: Embroidery machines. Hodge bid $10,010. Prehn bid $9,000.

Lot 3: Office Inventory. Hodge bid $6,000. Prehn bid $15,100.

Lot 4: Intellectual Property (including trademarks). Hodge bid $44,200. Prehn bid $5,100.

All of lots 1-4: Hodge bid $105,010. Prehn bid $125,200.

Before the auction, the shaker cup manufacturer estimated that the molds were worth $40,000 to $50,000, if used to manufacture cups, but were only worth $1,900 as scrap metal. After the auction, Hodge argued that because he was the high bidder on the intellectual property in Lot 4, no one else could use the shaker cup molds without violating the intellectual property rights he purchased. Because Prehn bid on the shaker cup molds intending to use them to manufacture cups, he subsequently decided not to pay Source 1 for the lots for which he was the highest bidder. As a result, Hodge declared himself the lone bidder for the items and purchased lots 1-4 for his $105,010 bid. Hodge did not use any of the proceeds from the auction to repay the Prehn loan or to compensate Prehn for his back wages. Prehn and Bandak filed a Second Amended Complaint on June 29, 2012.

### F. Growth of Source 2

At the same time that he began working as the Liquidator in the dissolution of Source 1, Hodge started operating Source 2, which is essentially a carbon copy of Source 1. Source 2 does the same work as Source 1 (*i.e.*, designing, developing, producing, and selling apparel and merchandise for promotional and marketing purposes). The office of Source 2 is the same office that was used by Source 1 and owned by Hodge. Source 2 had the same customers as Source 1

and employed many of the same people, including the employees tasked with completing the open orders for Source 1. On June 14, 2012, Bodybuilding.com placed an order with Source 2 identical to its earlier order with Source 1. This order was filled by Source 2.

As the Liquidator for the dissolution of Source 1, Hodge was responsible for completing the company's existing purchase orders, which were completed by September 2012. During the first three months of 2012, Source 1 had net sales of $782,854 with an operating profit of $83,135 or 10.62%. During this time, Source 1 reported General and Administrative expenses totaling $189,799.55 or 24.24%. Source 1 had net sales of $825,716 during the rest of 2012 and an operating *loss* of approximately $83,755 or 10.13%. This Report shows that during its dissolution, Source 1 exhausted its profits from the first three months of 2012 and all, or nearly all, of the proceeds from the asset auction. Source 1 reported paying Hodge a total of $26,124 during the first three months of 2012 and a total of $97,386 during the rest of the year. Hodge was also paid $9,999.97 by Source 2 in 2012.

Source 1's counsel filed a Report of Wind Up with the district court on January 17, 2013. The Report included a financial statement for 2012, which showed total sales for that year of $1,608,570 and an operating loss of approximately $620. In addition, the Report stated that there was a cash balance of $20,547.86, which was still subject to litigation expenses. Hodge, as the Liquidator, did not distribute any payment to any of the members of Source 1.

## G. Lawsuit and Bench Trial

Source 1 incurred legal and accounting fees of $2,417 during the first three months of 2012 and $59,495.84 during its dissolution. On September 26, 2012, the district court scheduled a bench trial for April 1, 2013. Hodge and Source 1 filed a Joint Motion to Dismiss the derivative claims on March 1, 2013, which the district court refused to hear on April 1, 2013, on the grounds it was not timely filed. On March 11, 2013, the parties filed a stipulation to dismiss with prejudice nine claims from the Second Amended complaint, which the court granted on June 6, 2013.

On June 19, 2013, the district court rescheduled the bench trial for December 2, 2013. A four-day bench trial was held from December 2–6, 2013. On February 19, 2014, the district court issued its Findings of Fact and Conclusions of Law. The district court found for Prehn and Bandak and awarded damages in the following amounts:

1. Source 1 owed Prehn $79,232 with 10% interest from December 29, 2011;

2. Source 1 owed Prehn $67,500 in back salary;

3. Source 2 owed Source 1 $38,687.83 for the software, the shaker cup discount, and the shaker cup mold credit; and

4. Hodge owed Source 1 $217,214.39 for the shortfall from the auction, lost profits, the difference between the value of the vehicle and the loan that Hodge paid, litigation costs for defense of this action, and the personal loan he received from Source 1.

Hodge, Brown, Clairborne, and Source 1 timely appealed the judgment.

### III.     ISSUES ON APPEAL

**1.** Whether the district court erred in denying Appellants' Joint Motion to Dismiss.

**2.** Whether the district court erred in finding that Hodge breached his fiduciary duty to Source 1 and its members.

**3.** Whether the district court erred in awarding attorney's fees under Idaho Code section 12-120(3) and section 30-25-802 for the derivative actions.

### IV.     STANDARDS OF REVIEW

Pursuant to Idaho Rule of Civil Procedure 16, a district court may issue a scheduling order governing deadlines for pretrial proceedings. A scheduling order may only be modified for good cause, and this Court will not reverse a district court's decision regarding whether to consider a late-filed motion absent evidence that the district court abused its discretion. *Weinstein v. Prudential Property and Cas. Ins. Co.*, 149 Idaho 299, 310, 233 P.3d 1221, 1232 (2010).

This Court reviews de novo conclusions of law from a district court in a bench trial, but "will not disturb findings of fact on appeal that are supported by substantial and competent evidence, even if there is conflicting evidence at trial." *Watkins Co., LLC v. Storms*, 152 Idaho 531, 535, 272 P.3d 503, 507 (2012) (citing *Panike & Sons Farms, Inc. v. Smith*, 147 Idaho 562, 565–66, 212 P.3d 992, 995–96 (2009)). Consequently, "[t]his Court will 'liberally construe the trial court's findings of fact in favor of the judgment entered, as it is within the province of the trial court to weigh conflicting evidence and testimony and judge the credibility of witnesses.'" *Id.* (quoting *Oregon Mut. Ins. Co. v. Farm Bureau Mut. Ins. Co. of Idaho*, 148 Idaho 47, 50, 218 P.3d 391, 394 (2009)).

"The award of attorney fees and costs is within the discretion of the district court and reviewed for an abuse of that discretion." *Kugler v. Nelson*, 160 Idaho 408, 413, 374 P.3d 571, 576 (2016) (quoting *Jim & Maryann Plane Family Trust v. Skinner*, 157 Idaho 927, 932, 342 P.3d 639, 644 (2015)).

## V. ANALYSIS

### A. We Do Not Reverse the District Court's Decision Regarding Whether to Consider the Late-Filed Joint Motion to Dismiss

Appellants argue that the district court erred in denying their Joint Motion to Dismiss as untimely. Appellants argue that Prehn and Bandak could not bring derivative actions on behalf of Source 1 because they did not fairly represent the interests of the members of Source 1 as a whole and had interests that were "economically antagonistic to Source 1." Appellants argue that Prehn and Bandak did not "fairly and adequately represent the interests of shareholders or members" as required by Idaho Rule of Civil Procedure 78, but were suing in pursuit of their own pecuniary interests.[2] Specifically, Appellants argue that Prehn's claims were antagonistic to Source 1 since he was simultaneously suing Source 1 for back salary and loan payments while bringing derivative claims on behalf of Source 1. Accordingly, Appellants reason, Prehn and Bandak's claims should have been asserted as direct claims rather than as derivative claims. Appellants further argue that Prehn and Bandak failed to make a demand that Source 1 take an action to enforce its right as required by Idaho Code section 30-25-802[3] or demonstrate that such a demand would be futile. Accordingly, Appellants argue that Prehn and Bandak lack standing for derivative claims on behalf of Source 1.

Finally, Appellants assert that Prehn created an inherent conflict of interest by being represented by the same attorney for both his suit on behalf of Source 1 and his suit against Source 1. To support this claim, Appellants cite Idaho Rule of Professional Conduct 1.7—prohibiting dual representation of clients with conflicting interests—and a decision by the district court in *Vorse v. D&R Real Estate*. Blaine County Case No. CV-2010-763.

Respondents argue that the district court correctly refused to hear Appellants' Joint Motion to Dismiss because it was filed late. Respondents argue that Appellants knew well in advance that the lawsuit included derivative claims and that Appellants had every opportunity to object to Respondents' standing for those claims before the deadline. Moreover, Respondents argue that even though the district court declined to hear Appellants' Joint Motion to Dismiss, Appellants were not prejudiced because the district court permitted them to make arguments concerning the standing issue during the bench trial. In addition, Respondents argue that they did

---

[2] Appellants do not cite any Idaho case law in support of their argument that parties with interests that are "economically antagonistic" to an LLC cannot bring derivative actions. Instead, Appellants rely on the Ninth Circuit case of *Larson v. Dumke*, 900 F.2d 1363 (9th Cir. 1990) to support their assertions.

[3] Formerly cited as Idaho Code section 30-6-902.

demonstrate that a demand to the members of Source 1 to enforce their rights would have been futile.

Lastly, Respondents argue that independent counsel for Source 1 to pursue the derivative claim was not necessary, and Respondents should have raised a motion to disqualify counsel if they felt that Respondents' counsel could not properly represent the interests of Source 1. In addition, Respondents argue that *Vorse* is distinguishable because in that case, the LLC took a more active role in the lawsuit and insisted on separate counsel being appointed to represent it on the derivative claims. In contrast, Respondents argue that Source 1 took a passive and neutral approach in this case, thereby waiving "any right to exercise any business judgment or control over the derivative claims."

A district court may issue a scheduling order governing deadlines for pretrial proceedings. I.R.C.P. 16. Absent evidence of a trial court's abuse of discretion, this Court will not reverse a district court's decision regarding whether to consider a late-filed motion. *Weinstein v. Prudential Property and Cas. Ins. Co.*, 149 Idaho 299, 310, 233 P.3d 1221, 1232 (2010).

Appellants fail to claim, much less demonstrate, that the district court abused its discretion in denying the Joint Motion to Dismiss. Therefore, we will not reverse the district court's decision regarding whether to consider the late-filed Joint Motion to Dismiss.[4]

## B. The District Court Did Not Err in Finding That Hodge Breached His Fiduciary Duty to Source 1 and Its Members

In order to recover for a claim of breach of fiduciary duty, Respondents had to establish that Hodge owed them and/or Source 1 "a fiduciary duty and that the fiduciary duty was breached." *High Valley Concrete, LLC. v. Sargent*, 149 Idaho 423, 428, 234 P.3d 747, 752 (2010) (quoting *Tolley v. THI Co.*, 140 Idaho 253, 261, 92 P.3d 503, 511 (2004)). As a manager of Source 1, Hodge owed the company and its members a fiduciary duty of loyalty and care under the Idaho Uniform Limited Liability Company Act, which required him to act in a way he "reasonably believe[d] to be in the best interests of the company." I.C. § 30-6-409.[5] Additionally, Hodge had a contractual fiduciary duty to Source 1 and its members under the

---

[4] Appellants' argument regarding Respondents' standing is unavailing. The demand requirement of a derivative claim is not part of a standing analysis.

[5] While section 30-6-409 has since been repealed by the legislature, its effective dates include the time of the complained of transactions in this case. Moreover, its current equivalent—Idaho Code section 30-25-409—requires a similar standard of care for managers.

9

Operating Agreement to "exercise reasonable skill, care and business judgment." *See*, I.C. § 30-25-105(a)(2)(establishing that an LLC's operating agreement governs "the rights and duties under this act of a person in the capacity of manager"). Moreover, under the Order of Dissolution, all members of Source 1 were required to participate and cooperate "in a manner which is fully transparent, accountable, fair and equitable to all members of Source 1 . . . ."

"Generally, whether a fiduciary has breached his duty is a question of fact," *Bushi v. Sage Heath Care, PLLC*., 146 Idaho 764, 769, 203 P.3d 694, 699 (2009) (citing *First Bank & Trust of Idaho v. Jones*, 111 Idaho 481, 484, 725 P.2d 186, 189 (Ct.App. 1986)). As such, this Court will not reverse the district court's decision as long as there was "substantial and competent evidence" to support the district court's findings. *Watkins Co., LLC v. Storms*, 152 Idaho 531, 535, 272 P.3d 503, 507 (2012) (citing *Panike & Sons Farms, Inc. v. Smith*, 147 Idaho 562, 565–66, 212 P.3d 992, 995–96 (2009)).

### 1. The Asset Auction

Appellants argue that the district court erred in finding that Hodge breached his fiduciary duty to Source 1 and its members by creating an unfair asset auction. Appellants further argue that Prehn's decision to place a high bid on the shaker cup molds but not on the intellectual property is not evidence that Hodge breached his fiduciary duty.

Respondents counter that the district court correctly held that Hodge breached his fiduciary duty to Source 1 and its members by structuring the asset auction in a misleading manner. Consequently, Respondents assert that the district court was correct in holding that the damage to Source 1 was the difference between what Hodge paid for the lots and what the total would have been if Hodge and Prehn had each paid for the lots for which he was the highest bidder.

There was substantial, competent evidence to support the district court's decision. While the record showed that Hodge did accept the suggestion of a closed bidding process and agreed to submit his final bid before the others had placed their final bids, the record also supports the conclusion that Hodge did so reluctantly. The record also indicates that he intentionally wrote a misleading label for the intellectual property lot and did not advise the other members that it included the design for the shaker cup molds. The substantial difference between the $5,000 bid from Prehn and the $44,000 bid from Hodge for the intellectual property strongly suggests that Hodge knew the true value of the intellectual property was in the shaker cup molds. Conversely,

10

Prehn's high bid on the shaker cup molds demonstrates that he did not understand that they could not be used without the intellectual property.

Although Hodge was not required to give Prehn business advice, the district court did not err in holding that Hodge did not act fairly or in the best interest of Source 1 by not advising Prehn that the shaker cup molds could not be used without the intellectual property. While Prehn was represented by counsel during the dissolution, Hodge cannot simply invoke the doctrine of caveat emptor to demonstrate that he acted in good faith. As such, there is sufficient, competent evidence to support the district court's finding that, but for Hodge's breach of his fiduciary duty, Source 1 would have received $165,310 from the asset auction. Thus, we affirm the award of $60,300 to Source 1; the difference between the $165,310 Source 1 would have received if Hodge and Prehn had both paid the full amount for the lots they won and the $105,010 that Hodge paid for all of the lots.

2. *Failure to Minimize Source 1's Expenses during the Dissolution*

Appellants argue that the district court erred in holding that Hodge breached his fiduciary duty by failing to minimize Source 1's expenses during the dissolution. Specifically, Appellants argue that Respondents did not meet their burden to prove the damages for lost profits with reasonable certainty.

Respondents argue that the district court did not err in finding that Hodge breached his fiduciary duty to minimize the expenses for Source 1 during the final nine months of dissolution. Respondents argue that Hodge did not minimize the expenses for Source 1 by giving himself a large salary as manager and Liquidator, by keeping highly compensated employees on the payroll even though they were also working for Source 2, and by charging Source 1 a higher rent for the building than it had been charged in the past. Respondents further argue that while there was some conflicting testimony regarding the best way to calculate how much profit Source 1 should have made during those nine months, there was still competent evidence to support the district court's damage award.

The district court compared Source 1's number of total sales, costs of sales, gross profit, selling expenses, and general and administrative expenses for January–March of 2012 with those from April–December 2012.[6] The district court noted that the only "glaring anomaly," was the

___

[6] Most of the numbers were comparable. Total sales were slightly more for the final nine months of 2012 ($825,716 compared to $782,854); total costs were 61.18% of total sales for January–March and 65.62% for April–December;

11

sudden spike in general and administrative expenses from 24.24% for January–March to 43.03% for April–December. Other than the litigation costs for Source 1, Hodge was not able to demonstrate why the general and administrative costs had increased drastically during Source 1's dissolution.

The district court noted that the 24.24% for general and administrative expenses for January–March was comparable to the 25.34% recorded for 2011 and the 27.61% recorded for 2010. The district court concluded that the sudden increase in general and administrative expenses was the reason that Source 1 did not turn a gross profit for the year of 2012. The district court found that one of the biggest expenses for Source 1 was Hodge's salary. From April–December 2012, Source 1 paid Hodge $97,386, despite the fact that he was concurrently working at Source 2—generating more than $1 million in sales—which only paid him $9,999.97 for all of 2012. The district court held that Hodge's overcompensation by Source 1 and undercompensation by Source 2 demonstrated a breach of Hodge's fiduciary duty to minimize expenses for Source 1.

Another expense that the district court noted was the increase in rent charged for the building Source 1 (and later Source 2) used as its office. In 2011, Source 1 paid approximately $2,900 per month for rent. In the first three months of 2012, Source 1 paid an average of $3,018 per month. After Hodge purchased the building in April of 2012, Source 1 paid an average of $5,841 per month from April–July when Source 2 took over the building. The district court found that this dramatic increase in rent was also a breach of Hodge's fiduciary duty to minimize expenses for Source 1.

Lastly, the district court determined that Hodge breached his fiduciary duty by converting the April 9, 2012 Bodybuilding.com purchase order from Source 1 to Source 2. The Bodybuilding.com order was for $223,481, and the district court held that Source 1 could have fulfilled it since many of the employees for Source 2 that filled the order also worked for Source 1. Moreover, Bodybuilding.com had placed an identical order with Source 1 before the dissolution order and before the formation of Source 2.

The district court found that Respondents had convincingly shown that Hodge redirected the order to Source 2 in breach of his fiduciary duty to Source 1. As such, the district court held

---

total gross profits for April–December were 34.32%, only slightly lower than the 38.82% from January–March; and selling expenses dropped from 4.03% for the first three months to 2.66% for April–December.

that Source 1's total purchase orders for the final nine months of (April–December) 2012 should have been $825,716 (purchase orders fulfilled by Source 1) plus $223,841 (Bodybuilding.com purchase order) for a total of $1,049,557. Using Source 1's profit margin for 2011 (8.66%), the district court calculated Source 1's lost profits for the dissolution period as $90,891. Because Appellants showed that Source 1 did incur additional legal and accounting fees during the dissolution period in the amount of $59,496, the district court subtracted that sum from the total profit, which resulted in a lost profit calculation of $31,395 for the dissolution period. When added to $83,135 in net profits from January–March, the district court found that Source 1's net profits for 2012 should have been $114,530.

While Appellants' expert testified that Prehn's calculations of lost profits was erroneous, the district court did not find his testimony persuasive, and he did not offer an alternative calculation. Thus, the district court found that Hodge breached his fiduciary duty to minimize expenses for Source 1 and awarded Source 1 $114,530 in lost profits. Although there was conflicting evidence regarding how to calculate lost profits, the record indicates that there was competent, substantial evidence supporting the district court's conclusion that Hodge breached his fiduciary duty to minimize Source 1's expenses. Further, there was competent, substantial evidence to support the district court's calculation of damages. As such, we affirm the district court's award of $114,530 in lost profits to Source 1.

### 3. Back Salary and Reimbursement for the Loan

Appellants do not assert that the district court erred in finding that Source 1 owes Prehn $67,500 in back salary and $79,232.51 for his loan to Source 1. Accordingly, we will not disturb the district court's finding.

### 4. Unjust Enrichment

The district court also found that Hodge's breach of fiduciary duty led to him and Source 2 being unjustly enriched in the following amounts: $20,084.61 for the balance of his personal loan from Source 1; $2,299.78 for the difference between the value of the vehicle and the amount Hodge paid on the loan; $8,000 for the ProfitMaker software license for Source 2; $18,287.83 for the value of the shaker cup credit used by Source 2; $12,400 for the value of the shaker cup mold deposit used by Source 2; and $20,000 for the legal fees paid to Hodge and Source 2's counsel by Source 1.

The district court rejected Hodge's argument that his debt should have been reduced because he did not collect all of his $144,000 salary for 2012. The district court determined that under the Operating Agreement, Hodge was only entitled to "reasonable compensation" and that during the dissolution period, his old salary from Source 1 was no longer reasonable because he was spending considerable time working for Source 2. Consequently, the district court held that Hodge had been unjustly enriched by not paying the balance of his loan from Source 1 because he received a benefit from it (*i.e.*, the loan), he appreciated the benefit, and it would be inequitable for him to accept the benefit without paying for it.

The district court also determined that Source 2 was unjustly enriched by acquiring certain benefits from Source 1 without payment. The district court further determined that Hodge breached his fiduciary duty to Source 1 by allowing Source 2 to utilize the ProfitMaker software license, the shaker cup credit payed for by Source 1, and the deposit on the shaker cup mold. Substantial, competent evidence supports the district court's findings that Hodge and Source 2 were unjustly enriched by receiving the aforementioned benefits. While Hodge argued that he purchased the ProfitMaker software at the auction, the record supports the district court's determination that he transferred the software to Source 2 before the asset auction. Therefore, we affirm the district court's findings that Hodge and Source 2 were unjustly enriched and its order that they compensate Source 1. In sum, we affirm the district court's award of damages in all amounts as being supported by substantial, competent evidence.

## C. The District Court Did Not Err in Awarding Attorney's Fees

The district court awarded $187,500 in attorney's fees. Of that amount, $162,500 was apportioned for the derivative claims and $25,000 was apportioned for Prehn's individual claims. Initially, the $162,500 awarded to Prehn and Bandak was enforceable against Source 1 and Hodge. However, in its Second Amended Judgment for Source 1, the district court recognized that it erred by allowing the same award to be enforced against both Source 1 and Hodge simultaneously. Accordingly, it explained that Source 1 was awarded $162,500 in attorney's fees enforceable against Hodge, and Prehn and Bandak were awarded $162,500 from Source 1. Although poorly explained, the district court's award of attorney's fees was correct.

As a preliminary matter, the $25,000 award for Prehn's individual claims was unaffected by the district court's Second Amended Judgment. In regards to the award of $162,500, there are two relevant statutes. First, Idaho Code section 12-120(3) mandates that when "the gravamen of

14

a lawsuit" is a commercial transaction, the prevailing party is entitled to attorney's fees. *Kugler v. Nelson*, 160 Idaho 408, 413, 374 P.3d 571, 579 (2016). Under the statute, a "commercial transaction" is any "transaction[] except transactions for personal or household purposes." I.C. § 12-120(3). The award of $162,500 to Source 1, enforceable against Hodge, was pursuant to this statute because the gravamen of the action between Source 1 and Hodge arose out of a commercial transaction.

Second, Idaho Code section 30-25-806 allows a plaintiff in a derivative action to recover reasonable attorney's fees and costs if he/she prevails in whole or in part. I.C. § 30-25-806. Specifically, subsection (b) provides: "If a derivative action is successful in whole or in part, the court may award the plaintiff reasonable expenses, including reasonable attorney's fees and costs, from the recovery of the limited liability company." I.C. § 30-25-806. It is important to highlight the fact that the attorney's fees are deducted from the recovery of the LLC. In accordance with this statute, the district court awarded Prehn and Hodge, as derivative plaintiffs asserting claims to enforce the rights of Source 1, $162,500 enforceable against Source 1.

In sum, the $162,500 in attorney's fees was first awarded to Source 1 enforceable against Hodge pursuant to Idaho Code section 12-120(3). Then, pursuant to Idaho Code section 30-25-806(b), the district court awarded Prehn and Bandak $162,500 enforceable against Source 1. Thus, the $162,500 first transfers from Hodge to Source 1, then from Source 1 to Prehn and Bandak.

## VI.  ATTORNEY'S FEES AND COSTS ON APPEAL

Both parties request attorney's fees and costs on appeal. Appellants assert that they are entitled to costs and attorney's fees pursuant to the Operating Agreement, which provides for reasonable costs and attorney's fees if a person covered under the Operating Agreement successfully defends a claim on its merits arising from the Operating Agreement. Respondents counter that because Hodge breached his fiduciary duty to Source 1, he committed "Disabling Conduct" that disqualifies him from being covered by the Operating Agreement even if Appellants prevail on appeal. Respondents further assert that they are entitled to attorney's fees pursuant to Idaho Code section 12-120(3) as the prevailing party on appeal. We hold that Respondents are the prevailing party; thus, costs and attorney's fees on appeal are awarded to Respondents.

## VII.  CONCLUSION

We do not reverse the district court's decision not to hear Appellants' Joint Motion to Dismiss. Further, we affirm the district court's finding that Hodge breached his fiduciary duty to Source 1 and its members. Specifically, we affirm the district court's awards related to the following: (1) Hodge's breach of his fiduciary duty as to the management of the asset auction; (2) Hodge's breach of his fiduciary duty related to his failure to minimize expenses during dissolution; (3) Prehn's entitlement to back salary and reimbursement for the loan; and (4) the unjust enrichment of Hodge and Source 2. We affirm the district court's award of attorney's fees. Costs and attorney's fees on appeal to Respondents.

Chief Justice J. JONES, Justices EISMANN, BURDICK and HORTON CONCUR.